PUBLISH

**UNITED STATES COURT OF APPEALS**

**Filed 4/19/96**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.                               No. 95-4070

FRANCHOT FORSYTHE MCRAE, JR.,

      Defendant - Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 93-CR-O35-S)**

Kenneth R. Brown, Salt Lake City, Utah, for Appellant.

Bruce C. Lubeck, Assistant United States Attorney (Scott M. Matheson, Jr., United States Attorney, with him on the brief), Salt Lake City, Utah, for Appellee.

Before **ANDERSON**, **BARRETT**, and **MURPHY**, Circuit Judges.

**ANDERSON**, Circuit Judge.

Franchot Forsythe McRae appeals his conviction and sentence on one count of possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841(a) (1). He was convicted by a jury following the denial of his motion to suppress cocaine seized following a traffic stop on Interstate 70 in Grand County, Utah. He was sentenced to 120 months imprisonment. We affirm.

**BACKGROUND**

On January 12, 1993, at mid-day, Utah Highway Patrol Trooper Ken Colyar observed a vehicle proceeding eastbound on Interstate 70 without a front license plate. The car had a California license plate on the rear. The sole occupant of the vehicle, Mr. McRae, was not wearing a seat belt. Officer Colyar stopped the vehicle, for the stated reason that both California and Utah require vehicles to have a front license plate and Utah requires drivers to wear seat belts.

When the officer stopped the car, he informed Mr. McRae of the reason for the stop. Officer Colyar testified that Mr. McRae "indicated something to the effect that he wasn't sure of that [the front license plate requirement], it wasn't his car." R. Vol. II at 12. When asked where he was going and whose vehicle he was driving, Mr. McRae told the officer that the car was rented and that he was "going to a friend's wedding in New York." Id. at 13. Officer Colyar asked for and received a valid California driver's license for Mr. McRae and the rental agreement for the car. Mr. McRae's name was on the rental

agreement, which indicated that he had rented the vehicle in Los Angeles on January 4, and that it was to be returned on January 14. Officer Colyar testified as follows concerning the encounter:

> Q. Okay. What did you ask Mr. McRae about the vehicle?
> A. I asked him about that. I asked him if he was going to be able to turn it in in New York or how he was going to get from New York back to California in two days.
> Q. What did he say?
> A. I don't really recall exactly what he said. I asked if he was going to be able to turn the car in in New York. He says he wasn't sure. I asked if he would like to be charged a late fee, that sort of thing.

Id. at 15.

After informing Mr. McRae that he was going to issue him a citation, Officer Colyar returned to his patrol car, taking with him Mr. McRae's driver's license and the rental agreement. While sitting in his patrol car, the officer ran a driver's license check, a registration check and wrote out a warning for failing to have a front license plate and a citation for not wearing a seat belt. Officer Colyar testified that, while he was sitting in his patrol car, he observed the following about Mr. McRae:

> A. He changed his demeanor in the car. He sat more upright, he adjusted his mirrors to watch me.
> Q. You say he sat upright. As you were speaking with him about the document that he was giving you and asking where he was going, how was he seated?
> A. He was seated, I call it -- he was very relaxed, kind of slouched back. Just looked up at me very calmly, talking to me.
> Q. And as you were at your vehicle, preparing to write whatever you were going to write, what did you see him do?
> A. Like I say, he sat more upright, he adjusted the rearview mirror.
> Q. Inside his vehicle?

- 3 -

A. Yes.
Q. What else did you see him doing?
A. He was watching me.
Q. How was he watching you?
A. He was looking in the mirror at me.
Q. Could you see his eyes?
A. Yes.

Id. at 17. The officer testified that such actions were "unusual." Id. at 45. Specifically, he testified that "[t]he way he did it I considered to be unusual . . . [b]ecause sitting up straight and readjusting his mirror, most people don't do that when you pull them over." Id. (emphasis added). Officer Colyar further stated that "[t]he way he was watching me, the intensity with which he was doing it, yes, I consider that to be unusual." Id. (emphasis added). When the officer noticed Mr. McRae "watching" him, Officer Colyar asked for a "Triple I" check to see if Mr. McRae had a criminal record.

Officer Colyar was informed that Mr. McRae's driver's license was valid, but that he had been arrested for "numerous . . . drug trafficking charges." Id. at 19. The police dispatcher advised the officer to use "extreme caution." Id. Officer Colyar asked for a back-up officer in the area.

After he finished writing the citation and warning, Officer Colyar walked back up to Mr. McRae's vehicle, leaving behind in his patrol car Mr. McRae's driver's license and rental agreement. The officer asked Mr. McRae if he had ever been arrested before, to which Mr. McRae responded that "he had a traffic citation that went to a warrant one time and that was it." Id. at 21. Officer Colyar proceeded to ask him if he had any firearms in

the car, to which Mr. McRae said "no." Id. at 22. The officer asked if he had any alcohol in the car, to which he again said "no," and finally, Officer Colyar asked if Mr. McRae had any narcotics in the car. Mr. McRae again responded negatively. Id.

Officer Colyar then said, "[D]o you mind if I look in the car?" Id. at 22. He testified that Mr. McRae said "no, not really." Id. Officer Colyar then asked Mr. McRae "to step out of the car, advised him that I was going to pat him down for weapons, he said he understood." Id. As he was getting out of the car, Mr. McRae "reached in the backseat and put [a leather jacket] on." Id. at 22-23. While patting him down, the officer felt a "sharp object" in the pocket of the jacket. When he asked Mr. McRae if it was a weapon, Mr. McRae responded negatively. When asked to take it out of his pocket, Mr. McRae did so, thereby revealing a "plastic grommet type fastener." Id. at 24.

At this point, Officer Colyar's back-up, Trooper Haycock, arrived, who identified the fastener as coming from the trunk of the car. Officer Colyar testified that Trooper Haycock asked Mr. McRae if he could search the trunk of the car, and Officer Colyar said "he gave an affirmative, yes, go ahead, or something to that extent," although he couldn't "recall word for word." Id. at 26. Mr. McRae testified that he was never asked whether the officers could specifically search the trunk. Id. at 70-71. When they searched the trunk, they discovered a row of fasteners identical to the fastener found in Mr. McRae's pocket "all along the top edge of the carpet" and one missing fastener, with "crinkled" carpet around it. Officer Colyar pulled back the carpet at that spot, and observed

cellophane packages inside, which contained cocaine. Mr. McRae was then arrested. The total length of time between the initial stop of Mr. McRae's car and the discovery of the cocaine was approximately five minutes. When the car was taken to police headquarters and a search warrant obtained, more packages containing cocaine were found.

Mr. McRae was indicted on one count of possession of cocaine with intent to distribute. He filed a motion to suppress the evidence seized from the vehicle. A magistrate judge held a hearing on the motion, and issued a report and recommendation recommending that the motion be denied. The district court adopted the magistrate judge's report, following de novo review of the record, and denied the motion. Following a two-day trial, the jury found Mr. McRae guilty. He now appeals, arguing: (1) the initial stop of his vehicle was an invalid pretextual stop; (2) after issuing the citation and warning, Officer Colyar lacked articulable suspicion to detain Mr. McRae further and question him about contraband;[1] (3) Officer Colyar lacked reasonable suspicion to frisk

---

[1]This is Mr. McRae's main issue on appeal. It affects all subsequent issues and, ultimately, whether the cocaine should be suppressed as evidence. Mr. McRae devotes more than twice the argument to this issue as he spends on any other, and the government responds fully. Both parties treat the evidentiary record below as properly developed on the issue, and refer to it extensively. Our own review of the record satisfies us that the testimony is complete on the point. It includes a step-by-step account by the officer of what occurred, what he observed, and what prompted his actions at each step. Thus, although this issue was not directly raised and ruled upon below--a detail seemingly lost on both parties on appeal--we elect to reach this question, strongly urged upon us by the defendant and the government. This is a complete answer to the concurrence's view that
(continued...)

- 6 -

Mr. McRae; (4) Mr. McRae did not voluntarily consent to a search of his vehicle, including the trunk; (5) the scope of the search exceeded any consent that was given; and (6) there was insufficient attenuation between any voluntary consent and the unlawful stop, detention and frisk.

**DISCUSSION**

When reviewing the denial of a motion to suppress, "we accept the trial court's factual findings unless clearly erroneous and review de novo the ultimate determination of reasonableness under the Fourth Amendment." United States v. Alvarez, 68 F.3d 1242, 1244 (10th Cir. 1995), petition for cert. filed, (U.S. Feb. 9, 1996) (No. 95-7833); United States v. Little, 18 F.3d 1499, 1503 (10th Cir. 1994) (en banc). Determinations of witness credibility we review for clear error. United States v. Flores, 48 F.3d 467, 468 (10th Cir.), cert. denied, 116 S. Ct. 122 (1995). We have stated that "the weight given to

(...continued)
we cannot or should not reach this issue. See Anixter v. Home-Stake Prod. Co., 1996 WL 31973 at *10 (10th Cir. 1996) ("[T]he [waiver] rule is not inflexible and '"the matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases."'") (quoting Colorado Interstate Corp. v. CIT Group/Equip. Fin., Inc., 993 F.2d 743, 751 (10th Cir. 1993) (quoting Singleton v. Wulff, 428 U.S. 106, 121 (1976))); Lyons v. Jefferson Bank & Trust, 994 F.2d 716, 720-21 (10th Cir. 1993); United States v. Easter, 981 F.2d 1549, 1556 n.5 (10th Cir. 1992), cert. denied, 508 U.S. 953 (1993); United States v. Strahl, 958 F.2d 980, 983 (10th Cir. 1992).

the evidence, as well as the inferences and conclusions drawn therefrom, are matters for the trial judge." United States v. Fernandez, 18 F.3d 874, 876 (10th Cir. 1993).[2]

A routine traffic stop is a seizure under the Fourth Amendment. See United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995) (en banc), petition for cert. filed, (U.S. March 1, 1996) (No. 95-8121). Such a stop is analyzed as an investigative detention, which must be "supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." Alvarez, 68 F.3d at 1244; see also United States v. Lambert, 46 F.3d 1064, 1069 (10th Cir. 1995). We employ a two-step inquiry when evaluating such investigative detentions, considering first "whether the officer's action was justified at its inception," and second "whether [the action] was reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. 1, 20 (1968); see Botero-Ospina, 71 F.3d at 786.

---

[2]Our circuit has not been entirely consistent in stating the appropriate review standard for a district court's finding of articulable suspicion. Compare United States v. Little, 60 F.3d 708, 714 (10th Cir. 1995) ("We review the question whether there was reasonable suspicion to support an investigatory detention under the clearly erroneous standard, although the ultimate determination of reasonableness under the Fourth Amendment we review de novo.") with United States v. Lambert, 46 F.3d 1064, 1067 (10th Cir. 1995) ("'We review de novo . . . the district court's conclusions as to when a seizure occurred and whether the officers had reasonable, articulable suspicion of criminal activity at the time of the seizure.'") (quoting United States v. Carhee, 27 F.3d 1493, 1497 (10th Cir. 1994) (citations omitted)). The Supreme Court has recently granted a petition for a writ of certiorari addressing this issue. See Ornelas v. United States, 16 F.3d 714, cert. granted, 64 U.S.L.W. 3340 (U.S. Nov. 6, 1995) (No. 95-5257).

**I. Validity of Initial Stop:**

Our recent en banc decision in Botero-Ospina disposes of Mr. McRae's argument that the initial stop of his vehicle was pretextual and therefore invalid. In that case, we adopted the following test for determining the constitutionality of a traffic stop: "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." Id. at 787. It is thus irrelevant whether the particular officer "would" have stopped the vehicle "'according to the general practice of the police department or the particular officer making the stop.'" Id. (quoting United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993), cert. denied, 115 S. Ct. 97 (1994)). It is equally irrelevant whether "the officer may have had other subjective motives for stopping the vehicle." Id.

As applied to Officer Colyar's stop of Mr. McRae's vehicle, Botero-Ospina's standard compels the conclusion that the stop was valid. Utah law requires vehicles to display a front license plate. Utah Code Ann. § 41-1a-404, § 41-1a-1305(5). Failure to wear a seat belt is a secondary offense, for which a citation or warning may be issued if another motor vehicle law has been violated. Utah Code Ann. § 41-6-182, 184. Mr. McRae does not dispute that the vehicle he was driving did not have a front license plate or that he was not at the time wearing a seat belt. The initial stop was therefore valid. We now turn to the validity of the detention following that initial stop.

- 9 -

## II. Validity of Detention Following Initial Stop:

As the Supreme Court has stated, an investigative detention must "last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983); see also United States v. Lee, 73 F.3d 1034, 1038-39 (10th Cir. 1996). In this case, Mr. McRae's vehicle was initially stopped because of equipment violations.

We have previously stated the parameters of permissible activity during a routine traffic stop:

> "'An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.'"

United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir.) (quoting United States v. Guzman, 864 F.2d 1512, 1519 (10th Cir. 1988), overruled in part on other grounds by, United States v. Botero-Ospina, 71 F.3d 783 (10th Cir. 1995) (en banc)), cert. denied, 114 S .Ct. 1862 (1994). Detention beyond that time period is only justified if the officer "has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring . . . [or] the initial detention has become a consensual encounter." Id. at 1483 (citations omitted). The government does not argue, nor could it, that the detention here evolved into a consensual encounter.[3] The government also does not argue, nor could it,

---

[3]In evaluating whether a traffic stop becomes a consensual encounter, we observe the "clear line historically drawn between police-citizen encounters which occur before
(continued...)

- 10 -

that the detention only lasted as long as is necessary to issue the citation and warning. It clearly lasted longer; indeed, Officer Colyar retained Mr. McRae's license and rental papers after he finished issuing the citation and warning, thus denying Mr. McRae his ability to go on his way. We must therefore determine whether Officer Colyar possessed reasonable articulable suspicion of illegal activity to justify this continued detention.

The government relies upon the following as providing articulable suspicion: (1) Mr. McRae said he had rented the car and was going to a wedding in New York, but the rental papers indicated the car was due back in Los Angeles in two days; (2) when Officer Colyar returned to his patrol car to issue the citation and warning, and to run the computer check on Mr. McRae's driver's license, Mr. McRae adjusted his mirror and intensely watched the officer; (3) when asked about his criminal record, Mr. McRae denied any arrests; and (4) Mr. McRae was nervous when asked about the criminal record.[4] When

---

[3](...continued)
and after an officer returns a person's driver's license, car registration, or other documentation." United States v. McKneely, 6 F.3d 1447, 1451 (10th Cir. 1993); see also Lambert, 46 F.3d at 1068. In this case, Officer Colyar retained Mr. McRae's license and the rental agreement up until the search of the trunk revealed the cocaine, and Mr. McRae was arrested.

[4]The government asserts in its brief, without citation to the record, that Mr. McRae was nervous when asked about his criminal record. We do not see where that assertion finds support in the record. Indeed, as Mr. McRae points out, Officer Colyar testified that Mr. McRae seemed relaxed and at ease through much of the encounter. We have held that nervousness alone is not sufficient to justify further detention; however, in combination with other suspicious circumstances, it might contribute to a finding of articulable suspicion. Cf. United States v. Fernandez, 18 F.3d 874, 879-80 (10th Cir. 1994) ("While nervousness may also appear as a factor in many traffic stop cases, we

(continued...)

evaluating whether these factors can provide articulable suspicion, we bear in mind that we, and the district court, evaluate the officer's conduct in light of "'common sense and ordinary human experience.'"  United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994) (quoting United States v. King, 990 F.2d 1552, 1562 (10th Cir. 1993)). We defer to "the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions."  United States v. Martinez-Cigarroa, 44 F.3d 908, 912 (10th Cir.) (Baldock, J., concurring), cert. denied, 115 S. Ct. 1386 (1995) (citing United States v. Sokolow, 490 U.S. 1, 8 (1989)).  We make our determination after evaluating the "totality of the circumstances."  United States v. Fernandez, 18 F.3d 874, 878 (10th Cir. 1994).

We have held that implausible or contradictory travel plans can contribute to a reasonable suspicion of illegal activity.  See United States v. Kopp, 45 F.3d 1450, 1453-54 (10th Cir.) ("[d]efendant's explanation of his travel plan and purpose was not plausible," where defendant said he was driving from California to North Carolina to take a "very dilapidated sofa to some friends" and he was vague about his actual destination), cert. denied, 115 S. Ct. 1721 (1995); United States v. Sanchez-Valderuten, 11 F.3d 985, 989 (10th Cir. 1993) (finding reasonable suspicion in part because of defendant's "unlikely" route, where defendant claimed to be going to New York but said he was

---

[4](...continued)
have never held that by itself it creates a reasonable suspicion of criminal activity.").

- 12 -

moving his family to the state of Washington). This case does not present as implausible or contradictory travel plans as those cases. Nonetheless, Mr. McRae's evident lack of concern about how he would return the rental car displays an unusually cavalier attitude towards a financial obligation most people take quite seriously. We conclude that his vague response to Officer Colyar's inquiries concerning his rental car arrangements correctly contributed to a reasonable suspicion in a trained and experienced officer like Officer Colyar.

The government also relies upon Mr. McRae's conduct in carefully watching Officer Colyar while the officer ran a check in his patrol car. Officer Colyar testified this was "unusual." Thus, this "unusual" behavior was, to Officer Colyar, suspicious behavior. Deferring to "the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions," Martinez-Cigarroa, 44 F.3d at 912, we conclude that the district court did not err in finding Officer Colyar credible and in finding that Mr. McRae's "unusual" behavior properly raised an articulable suspicion in an experienced officer that Mr. McRae was engaged in some unlawful conduct.

Finally, the government relies upon Mr. McRae's untruthful answer when asked if he had ever been arrested before.[5] As Mr. McRae points out, Officer Colyar had

---

[5]The government does not appear to argue in its brief that the mere fact of his prior criminal record itself contributed to a reasonable suspicion. However, Officer Colyar testified that the information he received from the Triple I check contributed to his articulable suspicion that Mr. McRae was involved in drug trafficking. Indeed, he

(continued...)

completed writing the citation and warning, but still held Mr. McRae's license and rental papers, when he asked about his prior record. Thus, the detention continued beyond the time necessary to issue the citation and warning when Officer Colyar made that inquiry. We must first determine, therefore, whether Officer Colyar had articulable suspicion to continue to detain Mr. McRae and ask him about his criminal record, and then to inquire about contraband.

As we have stated, at this point the officer was aware of three circumstances which, alone and in combination, made him suspicious: the vague rental car

---

[5](...continued)
testified as follows:

> THE COURT: What was the reason that you asked about alcohol, guns or narcotics in the vehicle?
> THE WITNESS: Because I suspected he was trafficking narcotics.
> THE COURT: What was it that gave you that suspicion?
> THE WITNESS: Dispatch came back and said the 10-0. They informed me he had been arrested for trafficking narcotics in the past.
> THE COURT: So it was that factor alone; is that right?
> THE WITNESS: Not alone. That factor along with what I perceived to be going on in the stop, not knowing when he had to have the car back, the rental car, the whole scene.
> THE COURT: All right. The Triple I information, the lack of information about the rental car, was there anything else?
> THE WITNESS: His demeanor.
> THE COURT: Which was his watching you in the rearview mirror.

R. Vol. II at 49-50. As we have stated, "knowledge of a person's prior criminal involvement (to say nothing of a mere arrest) is alone insufficient to give rise to the requisite reasonable suspicion." Lee, 73 F.3d at 1040 (quoting United States v. Sandoval, 29 F.3d 537, 542 (10th Cir. 1994)). It can, however, be a factor, along with other factors, giving rise to an articulable suspicion.

arrangements, Mr. McRae's behavior while watching Officer Colyar, and the Triple I

check's revelation that Mr. McRae had a record of drug trafficking arrests.[6] This

combination of suspicious circumstances would have permitted the officer to ask Mr.

McRae whether he was carrying contraband. Instead, the officer asked an intermediate

question--whether Mr. McRae had a criminal record--and his untruthful answer to that

question provided further articulable suspicion to ask if Mr. McRae was carrying

contraband and inquire about a search of the car.[7] See United States v. Carhee, 27 F.3d

---

[6]Mr. McRae does not argue that the officer was not entitled to run the Triple I
check. We have stated that an officer conducting a routine traffic stop may "'run a
computer check.'" Gonzalez-Lerma, 14 F.3d at 1483 (citations omitted). While a
"computer check" could encompass many different kinds of data retrieval, we have held
that an officer who had lawfully stopped a vehicle could contact "dispatchers who had
instant access to the National Crime Information Center (NCIC) computer records that
could quickly resolve, with reasonable certainty, whether there were warrants outstanding
against the driver and whether the car had been reported stolen." United States v.
Gonzales, 763 F.2d 1127, 1130 (10th Cir. 1985); see also United States v. Recalde, 761
F.2d 1448, 1455 (10th Cir. 1985) (officer's actions in conducting NCIC check "quickly
and concurrently with issuing the citation" were reasonable); cf. United States v. Crain,
33 F.3d 480, 485 (5th Cir. 1994) ("[W]hen questioning takes place while officers are
waiting for the results of a computer check--and therefore does not extend the duration of
the stop--the questioning does not violate Terry."), cert. denied, 115 S. Ct. 1142 (1995).

Triple I checks are run largely to protect the officer. Considering the tragedy of
the many officers who are shot during routine traffic stops each year, the almost
simultaneous computer check of a person's criminal record, along with his or her license
and registration, is reasonable and hardly intrusive.

[7]We of course do not suggest that an officer must always receive an untruthful
answer about a suspect's criminal history in order to have articulable suspicion to inquire
about contraband. In this case, it simply makes it very easy to conclude that Officer
Colyar, in the particular circumstances of this traffic stop, had articulable suspicion to
make that inquiry.

1493, 1497-98 (10th Cir. 1994) (defendant's lie about his departure city contributed to a reasonable suspicion permitting seizure of briefcase); United States v. Moore, 22 F.3d 241, 243 (10th Cir.) (same), cert. denied, 115 S. Ct. 238 (1994).

We therefore hold that the brief detention of Mr. McRae following his stop was lawful.

### III. Frisk of Mr. McRae:

The district court found that Officer Colyar had a reasonable suspicion to frisk Mr. McRae. Under Terry v. Ohio, 392 U.S. at 27, an officer may frisk a suspect for weapons if he has a reasonable articulable suspicion that "his safety or that of others [is] in danger." In this case, Officer Colyar had just received permission to search the vehicle, and he had just received information that Mr. McRae had a criminal history and should be approached with "extreme caution." He had, however, no other specific information leading him to believe that Mr. McRae was armed or dangerous. As the government argues, a search of the car might compel Officer Colyar to turn his back on Mr. McRae, and the two men were on an isolated stretch of highway. On the other hand, Officer Colyar permitted Mr. McRae to put on his jacket before getting out of the car, and a jacket is a likely place in which to store a weapon. Officer Colyar did not himself ever indicate, nor testify, that he in fact felt that his safety was in jeopardy.

We nonetheless hold that the district court did not err in finding that Officer Colyar had articulable suspicion to frisk Mr. McRae. The Terry stop standard is objective: "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" Terry, 392 U.S. at 21-22. The facts available to Officer Colyar here (he was alone on an isolated stretch of highway, he was about to engage in a search of a car, and he had just been warned to approach Mr. McRae with "extreme caution") would warrant a man of reasonable caution to believe that a frisk would be necessary to protect himself.

## IV. **Voluntariness of Consent:**

The district court found that Mr. McRae voluntarily consented to a search of the vehicle and the trunk. If the government seeks to validate a search based on consent, the government bears the burden of proving that the consent was freely and voluntarily given. United States v. Sandoval, 29 F.3d 537, 539 (10th Cir. 1994). We determine whether a consent was voluntary after evaluating the totality of the circumstances. United States v. Santurio, 29 F.3d 550, 552 (10th Cir. 1994); see United States v. Mendenhall, 446 U.S. 544, 557 (1980). A person who is being detained may still give a voluntary consent, United States v. Flores, 48 F.3d 467, 469 (10th Cir.), cert. denied, 116 S. Ct. 122 (1995), but if the detention is illegal, the government must prove that the primary taint has been purged and that the consent was in fact voluntary. United States v. McSwain, 29 F.3d

558, 562 (10th Cir. 1994). The government's burden is therefore heavier if the detention is illegal. Id.

We have a two-step test for determining the voluntariness of a consent: "First, the government must proffer 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given.' Furthermore, the government must prove that this consent was given without implied or express duress or coercion." United States v. Angulo-Fernandez, 53 F.3d 1177, 1180 (10th Cir. 1995) (quoting United States v. Dewitt, 946 F.2d 1497, 1500 (10th Cir. 1991), cert. denied, 502 U.S. 1118 (1992)). Mr. McRae argues that the "situation here was ripe with coercion and duress," Appellant's Br. at 28, because he had already been detained "for a period of time;" he was not free to leave because Officer Colyar retained his license and rental papers; and the sequence of questioning was coercive because Officer Colyar asked to search the car immediately after asking whether Mr. McRae carried contraband or firearms in the car and receiving a negative answer.

We hold that Mr. McRae's consent was voluntary, considering the totality of the circumstances. Although Mr. McRae was being detained at the time he gave his consent, he clearly gave a specific and unequivocal consent. There is no evidence of duress or coercion. Indeed, Officer Colyar testified that Mr. McRae seemed relaxed throughout the entire encounter. The district court correctly held the consent was voluntary.

## V. Scope of Search:

Mr. McRae argues the search of the trunk exceeded the scope of any consent that was given. Although the district court made no findings on the scope of the consent to search, Mr. McRae asserts that the facts are undisputed. Mr. McRae concedes that he acquiesced in a search of the car and in a search of the trunk.[8] His argument is that the consent to search the trunk did not extend to pulling up the carpet in the trunk and "otherwise dismantling areas of the trunk." Appellant's Br. at 31.

"It is clear that the scope of a consent search is limited by the breadth of the consent given." United States v. Pena, 920 F.2d 1509, 1514 (10th Cir. 1990), cert. denied, 501 U.S. 1207 (1991). We employ an "'objective' reasonableness" standard in evaluating the scope of a suspect's consent: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" United States v. Wacker, 72 F.3d 1453, 1470 (10th Cir. 1995) (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)). We determine from the totality of the circumstances "[w]hether a search remains within the boundaries of the consent" given. Pena, 920 F.2d at 1514. We view the evidence in the light most favorable to the government. Id. at 1514-15.

---

[8]At the hearing on the motion to suppress, Mr. McRae actually testified that he denied giving consent to search the trunk. In his brief on appeal, however, he concedes that he acquiesced when Trooper Haycock asked if he could search the trunk. Appellant's Br. at 31.

- 19 -

In this case, Mr. McRae consented to a search of the trunk of his car. Officers Colyar and Haycock had previously found on Mr. McRae's person a plastic fastener which they identified as coming from the trunk. Upon opening the trunk, it was immediately apparent that the fastener found in Mr. McRae's pocket probably came from the visible hole along the top of the trunk carpet, where the carpet was "crinkled." The evidence indicates that the officers merely lifted up the crinkled carpet area, revealing the contraband. In Pena, we held that a search was within the scope of the consent given where the defendant gave consent to "look" in his car and the police officer removed a panel from the car door. Officer Colyar's search here was even less aggressive than in Pena. See also Santurio, 29 F.3d at 553 (holding that removal of "a few screws from the strip holding down the carpet which covered the metal compartment containing the packages of cocaine" did not exceed scope of consent to search car).

Furthermore, at no time did Mr. McRae object to the search as conducted. As we have recognized, "'[f]ailure to object to the continuation of the search under these circumstances may be considered an indication that the search was within the scope of the consent.'" Id. at 1515 (quoting United States v. Espinosa, 782 F.2d 888, 892 (10th Cir. 1986)); see also Wacker, 72 F.3d at 1470 (holding "where a suspect does not limit the scope of a search, . . . an officer is justified in searching the entire vehicle"). We hold that the search did not exceed the scope of the consent given.

Because we have held that the detention and frisk were legal, we need not address Mr. McRae's last argument, that there was insufficient attenuation between the detention and frisk and the consent to search.

## CONCLUSION

For the foregoing reasons, we AFFIRM the denial of Mr. McRae's motion to suppress, and we AFFIRM his conviction and sentence.

**No. 95-4070,** *USA v. McRae*

**MURPHY**, Circuit Judge, concurring in part and concurring in the result:

I concur in the majority opinion except as to section II. As to that section, I concur only in the result. In section II of the majority opinion, the court analyzes whether the detention following the initial traffic stop was valid and ultimately concludes that it was. In my view, the court should not reach out and decide this issue. By doing so, the court stretches the boundaries of the Fourth Amendment under circumstances where the defendant did not raise and the district court did not consider the detention issue.

Our review of the post-stop detention issue is governed by Rules 12(b)(3) and 12(f) of the Federal Rules of Criminal Procedure. Rule 12(b)(3) provides that a motion to suppress evidence must be made before trial. Fed. R. Crim. P. 12(b)(3). Failure to do so results in a waiver. Fed. R. Crim. P. 12(f). According to Tenth Circuit precedent, the waiver provision set out in Rule 12(f) "applies not only to the failure to make a pretrial motion, but also to the failure to include a particular argument in the motion." *United States v. DeWitt*, 946 F.2d 1497, 1502 (10th Cir. 1991), *cert. denied sub nom. Rison v. United States,* 502 U.S. 1118 (1992); *see also United States v. Dirden*, 38 F.3d 1131, 1139 n.10 (10th Cir. 1994). Accordingly, McRae has waived the issue of the validity of his post-stop detention unless he presented that "particular argument" to the district court before he entered his guilty plea. *DeWitt*, 946 F.2d at 1502.

A careful review of the record reveals that McRae raised the issue of the legality of his post-stop detention for the first time on appeal. In his Motion to Suppress Illegally Seized Evidence (the "Motion"), McRae asserted the *stop* of his vehicle was improper because there were no objective facts upon which Officer Colyar could premise a belief that McRae "was committing or had committed a public offense *when he was stopped*." The Motion was clearly directed at the propriety of the stop rather than at the validity of the subsequent detention.

After an evidentiary hearing, McRae filed a Memorandum in Support of Motion to Suppress Illegally Seized Evidence (the "Memorandum"). In the Memorandum, McRae provided some content to his prior claim that the stop of his vehicle was improper. McRae claimed that the license and seat belt violations were mere pretext and that he had really been stopped because he was a black man driving a new Oldsmobile.[1] In addition to the pretext argument, the Memorandum set out the following grounds for suppressing the drugs: (1) the pat-down search was illegal because it was not supported by reasonable articulable suspicion; and (2) his consent to the search of his vehicle was not attenuated from the illegal stop and pat-down search.

---

[1]As noted by the majority, the pretext doctrine is no longer the law of this circuit. *See United States v. Botero-Ospina*, 71 F.3d 783, 786-87 (10th Cir. 1995) (en banc) (holding that police officer's subjective motives for stopping a vehicle are irrelevant), *petition for cert. filed*, -- U.S.L.W. ---- (U.S. Mar. 1, 1996) (No. 95-8121).

In a Report and Recommendation, the magistrate judge noted specifically that the Motion was limited to the issue of the legality of the stop of McRae's vehicle. He concluded, however, that he would consider the additional arguments raised in the Memorandum (*i.e.*, the legality of the pat-down search and the issue of consent) because the government would not be prejudiced and the suppression hearing had involved the receipt of evidence on those issues. The magistrate judge went on to note, however, that "[t]he defendant does not contend that his prior detention was illegal." Instead, McRae's argument was directed to the legality, under *Terry v. Ohio*, 392 U.S. 1 (1968), of the frisk conducted by Officer Colyar.

McRae filed an Objection to the magistrate judge's Report and Recommendation and incorporated the transcript of the suppression hearing as well as the Memorandum. McRae did not raise the legality of his post-stop detention in the Objection. Furthermore, in its Order adopting the Report and Recommendation, the district court limited its discussion to those issues addressed by the magistrate judge in the Report and Recommendation.

These indisputable procedural facts establish that McRae never raised the issue of the validity of the post-stop detention before he entered his guilty plea and that neither the magistrate judge nor the district court considered the matter. The consequence of McRae's failure is clear: he waived any objection that he might have had to the legality

of his post-stop detention when he failed to raise the issue before entering a guilty plea.[2]

Fed. R. Crim. P. 12(f); *DeWitt*, 946 F.2d at 1502; *Dirden*, 38 F.3d at 1139 n.10.

Notwithstanding this clear waiver, McRae raised the detention issue on appeal and the

United States chose not to assert that McRae had waived the issue.  There is, however, no

authority supporting the proposition that the United States' failure to assert the waiver

issue on appeal somehow cures McRae's failure to comply with Rule 12(f). *Compare*

*United States v. Baker*, 638 F.2d 198, 202 n.5 (10th Cir. 1980) (holding that the district

court's consideration of the merits of an untimely probable cause argument "does not

excuse [defendant's] untimeliness or enable [the court] to consider the merits" of

defendant's argument on appeal).[3]

Unlike the majority, I would hold that McRae has waived the issue and would not

reach out to decide whether the post-stop detention was constitutionally valid.  In this

fashion, I adhere to "[a] fundamental and longstanding principle of judicial restraint":  the

---

[2]Although Rule 12(f) provides an exception to the waiver rule for "cause shown," it is important to note that McRae has not made an effort to demonstrate any cause at all for his failure to assert, before the entry of his guilty plea, that his post-stop detention was invalid.

[3]Even in those cases where Rule 12(f) does not apply, this court has exercised its "discretion to hear issues for the first time on appeal only in the most unusual circumstances." *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 721 (10th Cir. 1993). Normally we reach issues not raised below only when it is necessary to prevent manifest injustice or when exceptional circumstances are present. *United States v. Strahl*, 958 F.2d 980, 982 (10th Cir. 1992); *United States v. Cheama*, 783 F.2d 165, 168 (10th Cir. 1986). This case does not present manifest injustice or exceptional circumstances.  More importantly, this case is governed by Rule 12(f).

avoidance of premature and unnecessary resolution of constitutional issues. *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988); *United States v. Kelly*, 1 F.3d 1137, 1139-40 (10th Cir. 1993) (quoting *Lyng*), *cert. denied*, 115 S. Ct. 342 (1994).

Judicial restraint is particularly appropriate in a case such as this. Because the issue was before him, the magistrate judge had to resolve the abstruse issue of reasonable articulable suspicion in the context of a pat-down search "on an isolated stretch of highway" by a peace officer faced with an individual that had "a record of drug charges and arrests." The focus of this inquiry is quite specific: did the officer have a reasonable articulable suspicion that "his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). The majority resolves to proceed to the merits of the detention issue, in the face of an unequivocal waiver expressly noted by the magistrate judge, by utilizing the magistrate judge's findings and analysis on the frisk issue. As the majority points out, analysis of the detention issue requires consideration of "reasonable articulable suspicion of illegal activity," a discretely different consideration from that applicable to the frisk issue and one that the district court chose not to undertake because McRae did not raise the issue.

Had McRae chosen to present the intensely factual detention issue to the district court, the appropriate fact finder, the district court could have considered the issue in the *proper* context: the continued detention of an African-American male with a valid

driver's license, in lawful possession of a rental car, whose only known transgressions were the failure to wear a seat belt[4] and failure to display a front license plate on the rental vehicle.[5] This court should not engage in fact finding on the detention issue when the appropriate fact finder, the district court, has refused to adjudicate the issue in light of McRae's failure to present the issue as a ground for suppressing the drug evidence.

[4]As the majority correctly notes, a seat belt violation is a secondary offense under Utah law and is insufficient, standing alone, to support a traffic stop. Utah Code Ann. §§ 41-6-182, 184.

[5]The majority's reliance on McRae's "vague response" and "cavalier attitude" in response to Officer Colyar's inquiries about the rental car demonstrate the dangers of reaching an issue as complex as the validity of a post-stop detention when neither the magistrate judge nor the district court has focused on the issue below. Based on Officer Colyar's testimony at the suppression hearing, the majority concludes that McRae was "vague" and "cavalier" about how and when he would return the rental car and that his response caused Officer Colyar to be suspicious. Those characterizations of the evidence are the majority's. The magistrate judge did not find that McRae was "cavalier" or that McRae had given Officer Colyar a "vague response" about his travel plans. Moreover, the magistrate judge did not find that McRae's response caused Officer Colyar to become suspicious. Instead, the magistrate judge found as follows: "The vehicle was a rental vehicle and defendant produced a rental agreement in his name. The vehicle had been rented in Los Angeles. The officer asked the defendant where he was going and he said to New York to attend a friend's wedding. The rental agreement expired on January 14th. The officer inquired as to whether defendant could go to New York and return to Los Angeles in time. Defendant said something about a late fee." Perhaps the magistrate judge *would have found* that McRae was vague and cavalier about the rental car, *if he had been asked to focus on this issue*. Perhaps the magistrate judge *would have found* that McRae's response caused Officer Colyar to become suspicious, *if he had been asked to focus on this issue*. Instead, the magistrate judge simply found that Officer Colyar asked McRae about returning the car in time and that McRae "said something about a late fee." Thus, because McRae failed to bring the issue before the district court, the majority is forced to turn to the testimony of the suppression hearing, rather than to a finding of fact, to conclude that McRae's response about the rental car was "vague" and "cavalier" and that the response caused Officer Colyar to become suspicious. Such fact finding should be reserved for the trial court.