Filed 8/15/96

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

LUIS ENRIQUES-HERNANDEZ,

    Defendant - Appellant.

No. 96-4018

D. Utah

(D.C. No. 95-CR-35)

## ORDER AND JUDGMENT[*]

Before **ANDERSON**, **BARRETT**, and **MURPHY**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34 (a); 10th Cir. R. 34.1.9. This cause is therefore ordered submitted without oral argument.

Luis Enriques-Hernandez entered a conditional guilty plea to possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). He now appeals the denial

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

of his motion to suppress, contending that after he arrived in Salt Lake City on a flight from Los Angeles, DEA Task Force officers violated his Fourth Amendment rights by having him accompany them from the public sidewalk outside the terminal to the airport security office, and then by searching his bag after a drug detection dog alerted on it. Specifically, he argues that the district court erred in ruling that: 1) his detention was supported by reasonable suspicion; 2) he was not under arrest at the time officers requested his consent to search; and 3) his consent to search was voluntary. We affirm.

## BACKGROUND

Shortly before midnight on March 1, 1995, two officers with the Los Angeles Airport Narcotics Task Force observed Enriques-Hernandez enter the terminal and walk directly to the Delta ticketing line.[1] R. Vol. II at 6-7, 15. After scanning the terminal area, Enriques-Hernandez used cash to purchase a one-way ticket in the name of Carlos Martinez for a flight departing at 6:00 a.m. for Salt Lake City. Id. at 8, 10, 15, 73. Enriques-Hernandez then walked into a nearby restroom and exited about a minute later. Id. at 16. He next passed through the security checkpoint and proceeded to a vacant boarding area where he joined a female Hispanic. Id. The two sat together and had a brief conversation, while both scanned the terminal area. Id. at 17. They then walked

---

[1]At times, only one officer made the noted observations. Enriques-Hernandez does not dispute these observations.

over to the flight display monitors, scanned the terminal again, and the woman handed Enriques-Hernandez a small, blue gym type bag. Id. Carrying the bag and closely watching the pedestrian traffic around him, Enriques-Hernandez slowly walked away from the woman to enter a nearby men's restroom. The male officer followed and noted Enriques-Hernandez already in one of the stalls. The officer heard a long zipping sound and the rustle of clothing, following which Enriques-Hernandez exited the stall and the restroom, apparently without having used the toilet. Id. at 19-20. Still carrying the bag, Enriques-Hernandez rejoined the woman, and the two entered a storage locker area which was out of the officers' view. When they emerged, neither had the bag. Id. at 21. The officers followed the couple out of the terminal to the parking lot, observing them get into a 1986 Cadillac and drive away. Id. at 11-12. The officers then contacted the DEA office in Salt Lake City and transmitted the foregoing observations and flight information. Id. at 12, 24, 56-57, 60-62, 70-73.

On the morning of March 2, officers Dahl and Gardiner were assigned to work with the Salt Lake Airport unit of the DEA task force and were given the above transmitted information. Id. at 26-27, 70-73. After confirming with the local Delta office that a Carlos Martinez had booked the 6:00 a.m. flight and paid cash for his ticket at 11:25 the night before, the officers waited at the arrival gate. Id. at 28, 73. The officers observed Enriques-Hernandez exit from the plane, noting that he and the blue bag he carried matched the relayed descriptions. Id. at 28, 57, 74. The officers followed

Enriques-Hernandez through the concourse, observing that he kept looking over his shoulder as if "he was looking for someone," or "trying to see if anybody was following him." Id. at 29, 74. While he was on the moving walkway, Enriques-Hernandez made a phone call on a small cellular phone, talked for a few seconds, and replaced the phone in his pocket. Id. at 29.

Once Enriques-Hernandez exited the terminal, Dahl approached him and, after identifying herself as a police officer, told him he was not under arrest, but was free to leave. Id. at 30. Dahl then asked if he minded answering some questions, and Enriques-Hernandez stated that he didn't mind. Id. Dahl inquired about Enriques-Hernandez's name, which he gave as Carlos Martinez. Asked about his travel, Enriques-Hernandez indicated that he had been in California four days visiting relatives, and he lived in Utah. He responded to each of the questions, looking Dahl directly in the eye, and clutching the bag tightly against his side. Id. at 31-32. Although Enriques-Hernandez indicated that he had no identification, he did produce his boarding pass in the name of Carlos Martinez, which Dahl immediately returned. Id. Dahl asked whether the blue bag was his only bag, and he answered affirmatively. When Dahl asked if he had packed it, Enriques-Hernandez answered that he had put two pairs of Levis in it. Dahl then asked if Enriques-Hernandez were carrying large sums of money, to which he said no. Id. at 32-33. Finally, Dahl asked if he were carrying narcotics. Enriques-Hernandez then broke eye contact, "dropped his head right to the ground[,]

looked at the ground and replied, 'No.'" Id. at 33. Dahl asked if she could look through his bag. Id. Although Enriques-Hernandez answered, "Yes," when Dahl reached for the bag, he pulled it back with both hands, and said, "No." Id. at 33-34, 76.

At that point, officer Gardiner, who had been standing out of sight behind Enriques-Hernandez stepped forward and identified himself. Id. at 76-77. Gardiner indicated that the officers wanted to subject his bag to a dog sniff for narcotics. Id. at 77. When Enriques-Hernandez gave no response, Gardiner asked where Enriques-Hernandez was born, and the reply was "Mexico." Id. Enriques-Hernandez's answers to the next questions were inconsistent. When asked whether he was an illegal alien, he answered, "Yes." However, when asked whether he had a green card, he answered that he did, but said he had left it with family in California. Id. The conversation with both officers lasted about five minutes. Id. at 78. Finally, Gardiner asked if Enriques-Hernandez would accompany them to their office for a dog sniff, and Enriques-Hernandez followed the officers back into the airport, up the escalators, across a moving walkway, to the parking structure where the office was located. Id. at 46, 78. The walk to the DEA office took about five minutes. Id. at 78. The entire period, from the time Enriques-Hernandez got off the plane until he arrived in the office, spanned from nine to seventeen minutes. Id. at 46-47.

Within a few minutes of arriving in the office, a trained narcotics dog alerted to Enriques-Hernandez's bag. Id. at 52, 79. Enriques-Hernandez was informed of the

positive result and asked for his consent to search the bag. For the first time, Enriques-Hernandez said he did not understand and asked for a Spanish speaking interpreter. Id. at 36-37, 80. At some point after the dog alerted, Enriques-Hernandez was moved to another, smaller office. Id. at 52, 94. The interpreter arrived about 9:40 a.m. Id. at 46. He advised Enriques-Hernandez that the dog had alerted to drugs in the bag, and that if Enriques-Hernandez refused to give his consent to search, the officers would try to get a search warrant for that purpose. Id. at 94-95, 98. Enriques-Hernandez indicated that he had no idea what was in the bag, although he confirmed that it was his. Id. at 98. After discussing the situation with the interpreter who translated the consent to search form, and indicating his understanding to the interpreter, Enriques-Hernandez agreed to the search and signed the form. Id. at 87-88, 98.[2] When the officers opened the bag, they found three kilo packages of cocaine underneath a pair of Levis. Id. at 37.

In his Report and Recommendation, the magistrate judge found that Enriques-Hernandez's encounter with the officers outside the terminal and escorted walk to the security office were consensual up to the point of the dog sniff, that thereafter he was detained on reasonable suspicion, and that he voluntarily consented to the search. Alternatively, the magistrate judge found that the officers possessed reasonable suspicion

_____

[2]At some point which is unclear from the record, the interpreter also advised Enriques-Hernandez of his Miranda rights and went over a Miranda waiver, which Enriques-Hernandez signed. R. Vol. II at 89-93, 98-99. At the suppression hearing, defense counsel objected to any evidence of the Miranda rights and waiver, stating that "they don't have anything to do with the consent to search." Id. at 90.

entitling them briefly to seize Enriques-Hernandez on the sidewalk and compel him to accompany them to the security office to subject his bag to a dog sniff. After conducting a de novo review, the district court adopted the Report and Recommendation in its entirety, holding that the initial encounter was consensual, or alternatively that the officers had reasonable suspicion, and Enriques-Hernandez's consent to search was voluntary.

## DISCUSSION

In reviewing the denial of a motion to suppress, we accept the district court's findings of historical fact unless they are clearly erroneous, and we consider the evidence in the light most favorable to the government. United States v. Lambert, 46 F.3d 1064, 1067 (10th Cir. 1995). However, we review de novo the ultimate question of reasonableness under the Fourth Amendment. Id.; see Ornelas v. United States, 116 S. Ct. 1657, 1661-63 (1996).[3]

---

[3]We noted in United States v. McRae, 81 F.3d 1528, 1533 n.2 (10th Cir. 1996), that our cases have not been consistent in stating the appropriate review standard for the district court's finding of reasonable suspicion. Ornelas settles the issue, overruling those cases which applied a clear error standard of review. Additionally, our cases on the appropriate standard of review for the district court's finding of probable cause are also inconsistent. Ornelas likewise overrules those cases which apply a clear error standard of review to the determination of probable cause. Ornelas v. United States, 116 S. Ct. 1657, 1663 (1996) (holding that determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal).

Enriques-Hernandez argues that the officers seized him, without reasonable suspicion, when they asked him to go to the airport security office. He argues further that the seizure progressed to an unlawful arrest prior to the time that he consented to a search of his bag, and that his consent--given while illegally detained--was invalid because it was coerced.

Both the magistrate judge and the district court thoroughly addressed these contentions, and we substantially adopt their reasoning and conclusions. We note that it is largely academic whether Enriques-Hernandez went to the security office voluntarily since, as the district court alternatively found, this case is saturated with reasonable suspicion supporting a brief investigative detention for a dog sniff. Likewise, when the drug detention dog alerted on Enriques-Hernandez's bag the officers had probable cause to arrest him, let alone simply detain him for a further brief period based on reasonable suspicion. See United States v. Williams, 726 F.2d 661, 663 (10th Cir.), cert. denied, 467 U.S. 1245 (1984); see also United States v. De Los Santos Ferrer, 999 F.2d 7, 10 (1st Cir.), cert. denied, 510 U.S. 997 (1993); United States v. Waltzer, 682 F.2d 370, 372 (2d Cir. 1982), cert. denied, 463 U.S. 1210 (1983). So, however viewed, when Enriques-Hernandez gave his consent to a search of his bag he was not being illegally detained.

As to the consent itself, the district court's determination that it was voluntary under all the circumstances is not clearly erroneous. See United States v.

Sanchez-Valderuten, 11 F.3d 985, 989-90 (10th Cir. 1993) (clear error standard of review).[4] At the suppression hearing, the interpreter testified that he fully explained the consent form signed by Enriques-Hernandez and that Enriques-Hernandez indicated his understanding before he signed it. R. Vol. II at 87-88; see United States v. Santurio, 29 F.3d 550, 553 (10th Cir. 1994) (finding a signed consent form persuasive in determining whether consent is voluntary). Further, the interpreter testified that he explained that Enriques-Hernandez did not have to consent, and if he did not, the officers would attempt to get a search warrant. Enriques-Hernandez did not dispute the interpreter's testimony that he understood the form, and, in fact, his own testimony, that no one told him he had

---

[4]In determining whether consent is voluntary, we apply a two step test. United States v. McRae, 81 F.3d 1528, 1537 (10th Cir. 1996). First, there must be "'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given.'" Id. (quoting United States v. Angulo-Fernandez, 53 F.3d 1177, 1180 (10th Cir. 1995) (internal quotation and citation omitted)). Second, "'the government must prove that this consent was given without implied or express duress or coercion.'" Id. There is no presumption that the consent was either voluntary or involuntary. Some recent Tenth Circuit opinions have quoted prior cases that indulged a presumption against the waiver of constitutional rights in the consent search context. See, e.g., United States v. Santurio, 29 F.3d 550, 553 (10th Cir. 1994) (quoting United States v. Recalde, 761 F.2d 1448, 1453 (10th Cir. 1985)); United States v. Muldrow, 19 F.3d 1332, 1336 (10th Cir.) (quoting United States v. Abbott, 546 F.2d 883, 885 (10th Cir. 1977)), cert. denied, 115 S. Ct. 175 (1994). The presumption against such waiver was overruled by United States v. Price, 925 F.2d 1268, 1270-71, 1271 n.3 (10th Cir. 1991) (en banc) ("The presumption against voluntary waiver of constitutional rights does not apply in consent search cases.") (citing Schneckloth v. Bustamonte, 412 U.S. 218, 235-37 (1973), which distinguished Fourth Amendment concern with consent searches from other fundamental rights under the Fifth and Sixth Amendments).

to consent and that he consented in order to avoid a further wait, supports the government's position.

AFFIRMED.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge