**UNITED STATES of America,
Plaintiff,**

v.

**Howard Lee RAMSTAD, Defendant.**

**No. 98–40085–01–DES.**

United States District Court,
D. Kansas.

Nov. 8, 2000.

Gregory G. Hough, Office of U.S. Attys., Topeka, KS, for Plaintiff.

Joseph D. Johnson, Topeka, KS, for Defendant.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on remand from the Tenth Circuit Court of Appeals. This court previously summarily denied defendant's motion to suppress (Doc. 11). The Tenth Circuit remanded the case for this court to make specific factual findings as to the following issues: (1) whether the original traffic stop violated the Fourth Amendment, (2) whether defendant gave consent to search, (3) whether, if the stop was illegal, defendant subsequently gave consent sufficient to remove the taint of the illegal stop, and (4) whether the scope of the search exceeded the scope of consent. *See United States v. Ramstad,* 219 F.3d 1263 (10th Cir.2000). For the following reasons, defendant's motion to suppress was denied.

## I. FINDINGS OF FACT

On September 9, 1998, the grand jury returned a one count Indictment charging defendant with possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1). Defendant filed a motion to suppress evidence. At the October 26, 1998, motion hearing, the court summarily denied defendant's motion to suppress. The court did not issue a written order, and no formal findings were announced. Defendant conditionally pled guilty to one count of possession with intent to distribute. Defendant preserved his right to appeal the denial of his motion to suppress and to withdraw his guilty plea in the event his appeal was sustained. On appeal, the Tenth Circuit remanded the case for further fact finding. The facts adduced at the hearing on the motion to suppress and relied upon by this court in denying defendant's motion to suppress are discussed below.

On Sunday, July 19, 1998, at approximately 10:20 a.m., Trooper Brian K. Smith, Kansas Highway Patrol ("KHP"), observed a 1964 GMC mobile home traveling east on I–70, just outside Topeka, Kansas. Trooper Smith noticed that the defendant's vehicle displayed only one California registration plate on the rear of the vehicle. On numerous occasions, Trooper Smith had patrolled and observed vehicles displaying only one vehicle registration plate from a state that required registration plates on the front and rear of vehicles registered in that state. Believing that California law required vehicles to display two registration plates, Trooper Smith ran a check on the registration plate. The dispatcher informed Trooper Smith that the plate was assigned to a 1964 GMC. Trooper Smith could not tell the actual year and/or make of the vehicle in question. There was nothing visible that would allow Trooper Smith to determine this information. Trooper Smith stopped the vehicle to warn the driver of the display of the registration and determine if the license was assigned to the vehicle.

Trooper Smith stopped the vehicle by activating the emergency lights on his patrol car. The vehicle pulled over in a timely fashion. Defendant promptly exited the vehicle and produced a California driver's license and proof of insurance. Based on his observations of defendant, Trooper Smith believed defendant was extremely nervous. As defendant handed his driver's license to Trooper Smith, Trooper Smith noticed defendant's hands were shaking and his breath was very rapid and shallow. Trooper Smith observed that the veins in defendant's neck were distended and his heart rate appeared to be very rapid when looking at the distended veins. Defendant appeared anxious and paced.

Defendant told Trooper Smith that he and his girlfriend were coming from San Diego, California, and going to Indianapolis, Indiana. He stated that they had been to Durango, Colorado. Trooper Smith informed defendant that he stopped him to investigate the display of the one registration plate. Defendant informed Trooper Smith that he had just recently purchased the motor home but added that he was unemployed at the time. Defendant showed Trooper Smith an insurance card dated June 30, 1998.

Defendant accompanied Trooper Smith to his patrol car. In Trooper Smith's patrol car, defendant continued to be nervous. Defendant was constantly licking his lips, flapping his legs, and fidgeting. Trooper Smith believed defendant was unusually nervous, given the situation as Trooper Smith had explained it. Defendant informed Trooper Smith that he was taking his girlfriend to the "Sullivan Show." Defendant stated they were also going to drive down to Ohio for about three days, for a total week long trip. Defendant then stated that his girlfriend might fly back. At this point, Trooper Smith returned to the mobile home to check the vehicle identification number ("VIN"). When Trooper Smith went to

look for the VIN, he spoke with the passenger, Ryn Reavis.

Reavis was seated on the couch of the bus, behind the driver's seat. Reavis told the trooper they were going to Indianapolis for a couple of weeks. She stated that she was going to see a friend who had a skin condition and that they were going to a talk show. She also stated that they began the trip last week. Trooper Smith noticed as he was inside the motor home that the wallpaper in the front of the bus was a different color from that in the back, which he believed was unusual. Trooper Smith located the VIN next to the entrance door.

Trooper Smith returned to his patrol car and issued defendant a written warning for failure to display a front registration plate. Trooper Smith returned defendant's documents to him and explained the ticket. At 10:29:49 a.m., Trooper Smith stated, "that's all I've got. Have a safe trip okay." At 10:29:49 to 10:29:57 a.m., defendant stayed in the patrol car and asked Trooper Smith about whether the police carried "CBs" and informed Trooper Smith that a driver up the road had called for help over the CB. At 10:29:58 a.m., before defendant could exit the patrol car, Trooper Smith stated, "Can I ask you a couple more questions real quick? We're all done with everything." Defendant replied yes, and at 10:30:01 a.m., Trooper Smith asked, "You guys aren't hauling anything illegal with you are you: no guns, drugs, weapons, contraband, large sums of money?" Defendant stated that he was not. At 10:30:06 a.m., Trooper Smith asked if he could take "a quick look around" the vehicle, stating that he "wasn't going to tear anything up." Defendant then gave Trooper Smith permission, provided he did not tear anything up. Trooper Smith testified that defendant did not appear to be under the influence of alcohol and/or drugs, nor did defendant appear to be laboring under a mental disease and/or defect of the mind. Trooper Smith did not threaten, coerce, or force defendant to consent to the search of his vehicle.

Defendant and Trooper Smith then exited the patrol car and returned to the motor home. At this point, Trooper Brinker had arrived and accompanied them to the motor home. Defendant told Reavis that the troopers wanted to search the motor home and that she should get out. Trooper Smith directed defendant and Reavis to stand on the shoulder of the highway to avoid the chiggers in the grass of the ditch. Trooper Brinker stood with defendant and Reavis as Trooper Smith entered the motor home.

Trooper Smith first went to the bedroom area where he noticed some irregularities: fresh scrapes and scratches on the rear wall where it meets the side walls in the corner, fresh trim and silicone in the corners over the wallpaper. Trooper Smith also noticed the speaker grill covers did not cover speakers, but just a small hole with a wire sticking out. Trooper Smith examined and unscrewed the speaker grill covers. Trooper Smith then exited the vehicle and walked to the rear of the vehicle. Looking at the back window of the passenger side, Trooper Smith observed a depth discrepancy of approximately twenty-eight inches in the rear wall of the motor compartment. Based upon his training and experience, Trooper Smith believed a false wall had been built-in to the motor home, which is a common practice for persons hauling controlled substances. At approximately one minute and thirty seconds after the search began, Trooper Smith contacted the dispatcher to have a K-9 narcotic dog respond to the location.

Approximately fifteen to twenty minutes later, Topeka Police Department Officer Larry Falley arrived with his K-9 dog. The dog alerted to the area where Trooper Smith observed fresh scratches and marks. Trooper Smith exited the motor home and asked defendant to follow Trooper Smith to a nearby KHP's shop so the troopers could further search the vehicle. Trooper

Brinker transported Reavis, and defendant drove the bus to the KHP shop. Upon arrival, Trooper Smith removed a mirror from the rear wall. Trooper Smith observed a panel in the center of the wall behind the mirror, secured with dry wall screws. Trooper Smith removed the panel and discovered 38 clear plastic-wrapped bundles of marijuana totaling 567.3 pounds.

A videotape was running on Trooper Smith's patrol car for a portion of these events. A true and accurate copy thereof was admitted as evidence at the hearing in this matter and viewed by the court.

## II. ANALYSIS

On remand, the court must make specific findings regarding: (1) whether the original traffic stop violated the Fourth Amendment, (2) whether defendant gave consent to search, (3) whether, if the stop was illegal, defendant subsequently gave consent sufficient to remove the taint of the illegal stop, and (4) whether the scope of the search exceeded the scope of consent.

### A. Legality of the Original Traffic Stop

Trooper Smith stopped defendant's motor home because it displayed only one California registration plate on the rear of the vehicle. Trooper Smith believed that Kansas traffic laws required vehicles from out-of-state to be in compliance with that state's motor vehicle laws. Defendant argues the lack of a front license plate is not a violation of Kansas traffic law, and therefore, Trooper Smith lacked probable cause or a reasonable articulable suspicion that a traffic violation of Kansas law had occurred.

Trooper Smith's decision to stop the vehicle and detain defendant constitutes a seizure within the meaning of the Fourth Amendment. *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Therefore, the stop is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). A traffic stop is reasonable under the Fourth Amendment at its inception if the officer has either (1) probable cause to believe a traffic violation has occurred or (2) a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction. *United States v. Botero–Ospina,* 71 F.3d 783, 787 (10th Cir.1995) (en banc). Thus, the court must decide whether Trooper Smith had probable cause or, at a minimum, a reasonable, articulable suspicion of a violation necessary to validly effectuate the stop. *Id.* at 788.

California law requires the display of the two license plates assigned to the vehicle:

> When two license plates are issued by the department for a vehicle, they shall be attached to the vehicle for which they were issued, one in the front and the other in the rear. When one license plate is issued for use upon a vehicle, it shall be attached to the rear thereof.

Cal. Veh.Code Div. 3, Ch. 1, Art. 9, § 5200. The government cites three Kansas statutes to support its argument that the officer could stop the California vehicle for failing to attach both license plates. There is nothing in either the "Drivers License Compact," codified as Kansas Statutes Annotated ("K.S.A.") § 8–1212, or the "Nonresident Violator Compact," codified as K.S.A. § 8–1219, which calls for the enforcement of another states' traffic laws. However, the court agrees that K.S.A. section 8–142 supports a finding that the stop was legal.

> Section 8–142 makes it illegal to:
> operate ... any vehicle ... which is not registered, or for which a certificate of title has not been issued or which does not have attached thereto and displayed thereon the license plate or plates assigned thereto by the division for the current registration year, including any

registration decal required to be affixed to any such license plate.

Under § 8–142, a vehicle which does not have the assigned license plate or plates attached is in violation of Kansas law. Since California assigned two license plates to the vehicle and the defendant failed to have both license plates attached, defendant was in violation of Kansas law.

In support of this analysis, the court turns to K.S.A. § 8–138a, which authorizes the operation of a foreign-registered vehicle in Kansas without a Kansas tag. K.S.A. § 8–138a, grants the privilege of operating a vehicle in Kansas which is "duly licensed" in another state to the extent that the other state grants reciprocal privileges to Kansas residents. A vehicle is not "duly licensed" in California if it does not attach both license plates assigned to the vehicle. The mere fact that the California vehicle is traveling through Kansas, which only assigns and require the display of one license plate, is not sufficient to make the vehicle tag valid and "duly licensed."

Defendant and the dissenting judge on remand argue that § 8–142 only applies to Kansas license plates. First, § 8–142 specifically refers to "the license plate or plates assigned thereto by the division." Kansas law defines division in this provision as "the division of vehicles of the department of revenue." Kan. Stat. Ann. § 8–126(v). Second, Kansas law provides the term license plate in this provision "shall be construed to mean and include any plate, tag, token, marker or sign issued ... for the purpose of identifying vehicles registered under the provisions of the motor-vehicle registration laws of this state." Kan. Stat. Ann. § 8–126(a).

■ Defendant's persuasive argument does not alter this court's opinion that the California vehicle was not "duly licensed." This court could find no Tenth Circuit opinion directly addressing the validity of

a stop which occurs in a state which only assigns and requires one license plate to be displayed, but involves a vehicle from a state which assigned two license plates and required both to be displayed.[1] Obviously, Trooper Smith believed, based on his ten years of experience and training with the KHP, that he could issue a ticket for failure to display both tags, although he was unsure where the authority for such action came from. In addition, courts and defense attorneys have failed to raise the issue of an illegal stop under these circumstances. *See United States v. Chavez–Ceja,* No. 98–3031, 1998 WL 654986 (10th Cir. Sept.21, 1998) (unpublished opinion) (Kansas trooper stopped car with California license plate because it only displayed a rear license plate; however, defendant did not dispute that the initial stop was valid).

The court interprets § 8–142 as requiring a "duly licensed" vehicle to display both license plates assigned the vehicle, regardless of which state assigned the license plates. Therefore, the court finds that the original traffic stop did not violate the Fourth Amendment.

## B. Consent to search

The court must determine if the continued detention of defendant after Trooper Smith issued the warning ticket violated defendant's Fourth Amendment rights.

"As a general rule, once an officer's purpose in a traffic stop based on probable cause or reasonable suspicion is complete, the officer must let the person go." *United States v. Ozbirn,* 189 F.3d at 1199 (10th Cir.1999) (*citing United States v. Wood,* 106 F.3d 942, 945 (10th Cir.1997)). Once Trooper Smith completed issuing defendant the traffic warning, Trooper Smith's justification for detaining defendant ended and defendant should have been permitted to continue on his way. "However, this

---

1. The Tenth Circuit upheld the initial stop of a California vehicle displaying only a rear license plate in Utah where both Utah law and California law require the display of two license plates. *See United States v. McRae,* 81 F.3d 1528, 1533 (10thCir.1996).

general rule is subject to a significant exception permitting an officer to engage in further questioning unrelated to the initial stop if he has probable cause, the consent of the suspect, or, at a minimum, a reasonable suspicion of criminal activity." *Id.*(*citing United States v. Lee*, 73 F.3d 1034, 1038–39 (10th Cir.1996) (probable cause or consent necessary to continue detention of suspect after completion of objectives of initial *Terry* stop)).

The government argues defendant gave consent to the continued detention and subsequent search. The government bears the burden of proof on whether the consent was voluntary, and the voluntariness of consent is a question of fact to be determined based on the totality of the circumstances. *United States v. Manuel*, 992 F.2d 272, 275 (10th Cir.1993) (*citing Schneckloth v. Bustamonte*, 412 U.S. 218, 228–29, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). The government must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given.*United States v. Price*, 925 F.2d 1268, 1270 (10th Cir.1991). "In deciding whether an encounter is consensual, the relevant inquiry 'is whether a reasonable person would feel free to decline the officer's requests or otherwise terminate the encounter.' " *Manuel*, 992 F.2d at 274 (*citing Florida v. Bostick*, 501 U.S. 429, 436, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)).

■ Based on the evidence before this court, it is clear that the defendant freely, voluntarily, intelligently, and verbally consented to allow Trooper Smith to search his vehicle. Defendant was not under the influence of alcohol or drugs, nor did defendant have a mental disease or defect of the mind. There is no evidence that Trooper Smith threatened, coerced, or forced defendant to consent to the search of his vehicle. Trooper Smith returned defendant's documents to him prior to seeking and obtaining defendant's consent to search the vehicle. *See United States v.*

*Gonzalez–Lerma*, 14 F.3d 1479, 1483 (10th Cir.1994) ("an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him"). In addition, Trooper Smith twice implied the encounter was finished, although he never explicitly stated defendant was free to leave. Trooper Smith stated, "that's all I've got. Have a safe trip okay" and later stated, "Can I ask you a couple more questions real quick? We're all done with everything." *See United States v. McSwain*, 29 F.3d 558, 563 (10th Cir.1994) (considering whether the officer informed the defendant that he was free to leave the scene as a factor to determine voluntariness). The court finds under the totality of the circumstances, defendant's consent to search his vehicle was voluntarily and intelligently given to Trooper Smith.

## C. Whether Consent Removed the Taint of Illegal Search

The court must also determine whether, if the initial stop was illegal, the consent was sufficient to remove the taint of the illegal stop. The standard for evaluating whether the consent removed the taint of an illegal stop is described below:

Even though voluntary consent may be given by a person who is detained, *United States v. Flores*, 48 F.3d at 469, if the consent is given after an illegal stop, the government carries a heavy burden of showing that the primary taint of the illegal stop was purged so that the subsequent consent was voluntary in fact. *United States v. Fernandez*, 18 F.3d 874, 881 (10th Cir.1994). To satisfy this burden the government must prove, from the totality of the circumstances, a sufficient attenuation or "break in the causal connection between the illegal detention and the consent." *McSwain*, 29 F.3d at 562 n. 2. When examining the totality of the circumstances, no single fact is dispositive although the three factors set forth in *Brown v. Illinois* are especially significant: "the temporal proximity of the illegal stop

and consent, any intervening circumstances, and purpose and flagrancy of [the official] misconduct." *Fernandez*, 18 F.3d at 882 (*citing*, *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975)). *United States v. Gregory*, 79 F.3d 973, 979 (10th Cir.1996).

■ The court finds that the defendant did not give consent sufficient to remove the taint of the illegal stop. Trooper Smith returned defendant's documents after issuing him a written warning ticket. At 10:29:49 a.m., Trooper Smith stated, "that's all I've got. Have a safe trip okay." At 10:29:49 to 10:29:57 a.m., defendant stayed in the patrol car and asked Trooper Smith about whether the police carried "CBs" and informed Smith that a driver up the road had called for help over the CB. At 10:29:58 a.m., before defendant exited the patrol car, Trooper Smith stated, "Can I ask you a couple more questions real quick? We're all done with everything." Defendant replied yes, and at 10:30:01 a.m., Trooper Smith asked, "You guys aren't hauling anything illegal with you are you?" Defendant stated that he was not. At 10:30:06 a.m., Trooper Smith asked if he could take "a quick look around" the vehicle, stating that he "wasn't going to tear anything up," to which defendant stated he could.

Under these circumstances, the court does not find the consent was sufficiently attenuated from an illegal stop based on the *Brown* factors. First, as to temporal proximity of the illegal stop and consent, Trooper Smith asked for defendant's consent only eight seconds after completing the alleged purpose of the stop. An eight second interval between the completed stop and request for consent suggests the consent was not attenuated from an illegal stop.

Second, there were no intervening circumstances to purge the taint of an illegal stop. Examples of circumstances sufficient to create a discontinuity between the illegal stop and search include the presence of counsel, appearance before a mag-istrate, the issuance of Miranda warnings, telling the driver he is free to leave, and advising him of his right to refuse consent. *Gregory*, 79 F.3d at 980. Defendant's eight second exchange with Trooper Smith about the CB and stranded motorist while defendant was still seated in the patrol car cannot be considered an intervening circumstance. The conversation was not substantial enough to break the chain of events. Although the trooper suggested defendant was free to leave, the trooper did not explicitly inform defendant that he was free to leave. Only two statements by the trooper could be construed as telling defendant he was free to leave. The first was the troopers statement "that's all I've got. Have a safe trip okay," which immediately preceded the CB discussion. The second was not made until after Trooper Smith asked if he could ask defendant a few more questions immediately after the CB discussion: "Can I ask you a couple more questions real quick? We're all done with everything." These statements by the trooper are not sufficient to create an intervening circumstance.

Finally, the third factor is to consider the purpose and flagrancy of the official misconduct. Trooper Smith offered two reasons for continuing to detain defendant after the purpose of the initial stop was completed and requesting defendant's consent to search: (1) Smith's observations that defendant was nervous and (2) defendant and Reavis' travel plans were inconsistent. The Tenth Circuit has "repeatedly held that nervousness is of limited significance." *United States v. Wood*, 106 F.3d 942, 948 (10th Cir.1997). In addition, the travel plans were not so inconsistent as to raise suspicion. Both defendant and Reavis stated they were going to Indianapolis to see a television show. Reavis added that she was visiting a friend. The stop occurred on a Sunday. Reavis explained that they left on their trip "last week," and defendant said they left on Tuesday. These statements are not meaningfully inconsistent. The stated

reasons for continuing the detention after the purpose of the initial stop was completed do not support the trooper's conduct.

Considering all the factors discussed above, if the initial stop was illegal, defendant's consent was not sufficient to remove the taint of the illegal stop.

## D. Scope of Consent

■ As the court determined the stop was legal and defendant's consent was voluntarily and intelligently given, the court must now determine whether the search exceeded the scope of consent.

The scope of a search "is generally defined by its expressed object . . . and limited by the breadth of the consent given." *United States v. Elliott,* 107 F.3d 810, 815 (10th Cir.1997) (internal citations and quotation omitted). "The standard for measuring the scope of an individual's consent to search is that of 'objective reasonableness,' asking what the typical reasonable person would have understood to be the scope of his or her consent under the circumstances." *United States v. Pena,* 143 F.3d 1363, 1367–68 (10th Cir.1998) *(citing Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)). It is clear that defendant's consent encompassed taking a quick look around and not tearing anything up.

The court first considers whether the scope of the search went beyond the expressed limitation of taking a "quick look around." Defendant and Reavis stood on the highway's shoulder as the roadside search occurred. Defendant drove the mobile home to the KHP shop, where he and Reavis were present while Trooper Smith continued the search. At no time after giving the consent to search did defendant or Reavis object to Trooper Smith's searching the vehicle or the length of time it took to conduct the search. A defendant's failure to object to the extent of the search "may be considered an indication that the search was within the scope of consent." *United States v. McRae,* 81

F.3d 1528, 1538 (10th Cir.1996). The Tenth Circuit has "consistently and repeatedly held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent." *United States v. Gordon,* 173 F.3d 761, 766 (10th Cir.1999). Defendant never objected to the manner or length of the search.

To the extent that defendant's consent limited the search to not "tearing anything up," the court finds the officer did not tear anything up. Trooper Smith examined and unscrewed the speaker grill covers. Nothing in the vehicle was damaged. Trooper Smith clearly expressed the purpose of his search, when he asked, "You guys aren't hauling anything illegal with you are you: no guns, drugs, weapons, contraband, large sums of money?" A reasonable person, knowing an officer is searching for drugs, would expect the officer conducting the search to look in areas where drugs might be hid. Because "[o]ne in possession of illegal narcotics does not typically leave them out in the open[,][c]onsent to an officer's request to search for drugs would reasonably include areas in which one would be expected to hide drugs." *Pena,* 143 F.3d at 1368.

The Tenth Circuit has upheld similar searches. In *United States v. Santurio,* 29 F.3d 550, 553 (10th Cir.1994), the court held removal of a few screws from a strip holding down carpet which covered a metal compartment containing drugs did not exceed the scope of consent to search the car. Specifically, the court found that removing the screws was not "tearing up" the vehicle. The court has also concluded that consent to look in the car included removing a vent panel from the car door, *United States v. Pena,* 920 F.2d 1509, 1514–15 (10th Cir.1990), and consent to look in the trunk included lifting up carpeting in trunk. *McRae,* 81 F.3d at 1537. The court finds Trooper Smith did not

exceed the scope of consent or "tear anything up" when he unscrewed the speaker covers.

Considering the totality of the circumstances, Trooper Smith's search of the motor home did not exceed the scope of defendant's expressed consent.

### III. CONCLUSION

The court found the stop was legal, consent was voluntarily given, and the search did not exceed the scope of consent. The court also found that if the stop was illegal, defendant's subsequent consent was not sufficient to remove the taint of the illegal stop.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's motion to suppress (Doc. 11) was denied for the reasons stated above.