**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 24 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

HOWARD LEE RAMSTAD,

    Defendant - Appellant.

No. 00-3407

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 98-CR-40085-01-DES)**

---

Joseph D. Johnson, Law Office of Joseph D. Johnson, Chtd., Topeka, Kansas, for Defendant-Appellant.

Robin D. Fowler, Assistant United States Attorney (Gregory G. Hough, Assistant United States Attorney, and Jackie N. Williams, United States Attorney, Topeka, Kansas, on the brief), Topeka, Kansas, for Plaintiff-Appellee.

---

Before **EBEL**, **BALDOCK**, and **KELLY**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

On March 2, 1999, Defendant-Appellant Howard Lee Ramstad conditionally pled guilty to knowingly and intentionally possessing with the intent to distribute 100 kilograms or more of a substance or mixture containing a detectable amount of marijuana, in violation of 21 U.S.C. § 841(a)(1). As part of his conditional guilty plea, which was entered pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure, Mr. Ramstad reserved the right to appeal the district court's denial of a pretrial motion to suppress the marijuana, which Mr. Ramstad argued was obtained in violation of his Fourth Amendment rights. The district court subsequently sentenced Mr. Ramstad to fifty-one months in prison, four years of post-release supervision, and a $100.00 assessment, and Mr. Ramstad appealed the district court's denial of his suppression motion. Finding that "the district court did not make any findings or otherwise explain the basis for its decision [denying Mr. Ramstad's motion to suppress the marijuana]," we remanded Mr. Ramstad's appeal to the district court "for further fact-finding." United States v. Ramstad, 219 F.3d 1263, 1265 (10th Cir. 2000). On remand, the district court again denied Mr. Ramstad's suppression motion, and this appeal followed. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and we now affirm.

# I. BACKGROUND

The events surrounding Mr. Ramstad's arrest and guilty plea were discussed in detail in our prior decision, see Ramstad, 219 F.3d at 1264-65, as well as in the district court's opinion on remand. See United States v. Ramstad, 120 F. Supp. 2d 973, 975-77 (D. Kan. 2000). Accordingly, we limit our discussion here to those facts most relevant to the present appeal.

On Sunday, July 19, 1998, Trooper Brian K. Smith of the Kansas Highway Patrol (KHP) observed Mr. Ramstad's motor home traveling on Interstate 70, near Topeka, Kansas. Trooper Smith noticed a California license plate on the rear of the vehicle, but he did not observe a front license plate. Although Kansas law generally only requires vehicles to display a rear license plate, see Kan. Stat. Ann. § 8-133, Trooper Smith believed that, under California law, California vehicles must display both a front and a rear license plate. Trooper Smith further believed that an interstate compact between California and Kansas authorized Kansas patrol officers to stop out-of-state vehicles that were not in compliance with their home state's motor vehicle laws, even if the out-of-state vehicle was not violating any Kansas laws governing Kansas vehicles. Consequently, Trooper Smith began following Mr. Ramstad's vehicle and "ran the registration plate [he had seen] through the Topeka dispatch," which informed him that the plate belonged to a 1964 GMC vehicle. Unable to determine the vehicle's make and model, Trooper

Smith activated his emergency lights and pulled over Mr. Ramstad's motor home. At the time he initiated the stop, Trooper Smith intended (1) to warn the driver that California vehicles must display a front license plate and (2) to ascertain whether, in fact, the vehicle was a 1964 GMC.

After the vehicle pulled over, Trooper Smith approached Mr. Ramstad, who produced a valid California driver's license, as well as the vehicle's proof of insurance. See Ramstad, 219 F.3d at 1264; Ramstad, 120 F. Supp. 2d at 975. Mr. Ramstad appeared "extremely nervous" to Trooper Smith. Ramstad, 219 F.3d at 1264. He noticed that Mr. Ramstad's hands shook as he presented his driver's license, observed that "the veins in his neck were distended," and, given his distended veins, thought that his heart rate "was very rapid." Mr. Ramstad also paced back and forth as he spoke with Trooper Smith.

Trooper Smith later asked Mr. Ramstad about his travel plans, and Mr. Ramstad indicated that he was driving from San Diego, California, to Indianapolis, Indiana. He also explained that during the journey, he had stopped in Durango, Colorado. At some point, Mr. Ramstad and Trooper Smith left the roadside and went to Trooper Smith's patrol car, where Mr. Ramstad's nervous behavior continued. While in the patrol car, Mr. Ramstad indicated that he was traveling to Indianapolis because his girlfriend, Ryn Reavis, who was a passenger in the motor home, was going "to be on a Talk Show of some sorts." He also informed Trooper

- 4 -

Smith that he had purchased the motor home recently, but that he was currently unemployed.

Trooper Smith then left Mr. Ramstad in the patrol car and returned to the motor home to verify its vehicle identification number (VIN). While in the vehicle, Trooper Smith encountered Ms. Reavis, who told him that she and Mr. Ramstad were traveling to Indianapolis "to see a friend who had a skin condition." Ramstad, 120 F.Supp. 2d at 976. During his conversation with Ms. Reavis, Trooper Smith noticed that the wallpaper in the bedroom area of the motor home differed from the other living areas of the vehicle, which, based on his experience, Trooper Smith found unusual.

Trooper Smith subsequently returned to his patrol car and explained to Mr. Ramstad that he would receive a warning citation for not displaying a front California license plate. Trooper Smith then returned Mr. Ramstad's proof of insurance and driver's license, gave him the citation, and told him "[T]hat's all I got. Have a safe trip okay." Ramstad, 120 F. Supp. 2d at 976. During the next eight seconds, Mr. Ramstad asked Trooper Smith if the Kansas Highway Patrol monitored "CB" traffic, explaining that a driver up the road had radioed for assistance. Ramstad, 120 F. Supp. 2d at 976. Literally one second after Mr. Ramstad finished his statement, and before Mr. Ramstad exited the patrol car, Trooper Smith asked Mr. Ramstad, "Can I ask you a couple of questions real

- 5 -

quick? We're all done with everything." Mr. Ramstad quickly consented to the additional questioning, and Trooper Smith asked, "You guys aren't hauling anything illegal with you are you: no guns, drugs, weapons, contraband, large sums of money?" Mr. Ramstad denied hauling anything illegal. Trooper Smith immediately responded by asking for permission to take "a quick look around" the motor home. Mr. Ramstad consented to the search, provided that Trooper Smith would not "tear anything up." Trooper Smith agreed that he would not tear anything up.

Once inside the motor home, Trooper Smith noticed discrepancies in the wall near the bedroom area, including a recessed area, recent scrapes and scratches on the wall, and fresh caulking, screws, and trim. He also noted "that the speaker grill covers [in the wall] did not cover speakers, but just covered a small hole with a wire." Ramstad, 219 F.3d at 1264. In the course of this search, Trooper Smith unscrewed and removed the speaker covers. Ramstad, 120 F. Supp. 2d at 976.

Trooper Smith then exited the motor home and walked to the rear of the vehicle, where he observed a depth discrepancy of approximately twenty-eight inches between the interior and exterior walls of the motor home. Based on his prior experience, Trooper Smith suspected that the motor home contained a false wall. At that point, Trooper Smith radioed his Topeka dispatcher and requested that a K-9 narcotics dog be sent to inspect the vehicle. The drug sniffing dog

arrived ten to fifteen minutes later. Inside the vehicle, the dog alerted at the rear wall, near the same area where Trooper Smith had noticed "fresh scratches and marks." Ramstad, 219 F.3d at 1264.

After the dog alerted, Trooper Smith asked Mr. Ramstad to drive the motor home to a nearby KHP facility, where Trooper Smith removed a mirror and plywood panel from the rear of the motor home. Behind the panel, Trooper Smith discovered thirty-eight plastic-wrapped bundles containing 567.3 pounds of marijuana.

Prior to trial, Mr. Ramstad filed a motion to suppress the marijuana. Among other things, Mr. Ramstad argued that the stop preceding the discovery of the marijuana was illegal because the failure to display a front license plate in accordance with California law did not violate Kansas law. Second, assuming the stop's illegality, Mr. Ramstad contended that his consent to Trooper Smith's search did not purge the illegality of the stop. Third, even if the stop was legal, or his subsequent consent to the search purged any illegality, Mr. Ramstad asserted that Trooper Smith exceeded the scope of his consent by unscrewing and removing the speaker covers. Ramstad, 219 F.3d at 1265.

In response, the government argued several provisions of Kansas law justified the stop. First, the government cited two interstate compacts joined by Kansas, the "Driver License Compact," Kan. Stat. Ann. § 8-1212, and the

"Nonresident Violator Compact," Id. § 8-1219, which, argued the government, "provide that Kansas shall give full faith and credit to the traffic laws of its sister states and the District of Columbia, and report traffic offenses to sister jurisdictions." Aplt. App., Vol. I at 29. Second, the government invoked § 8-142 of the Kansas Statutes Annotated, which makes it illegal to operate a vehicle that "does not have attached thereto and displayed thereon the license plate or plates assigned thereto by [the Kansas] [D]ivision [of Vehicles of the Department of Revenue] for the current registration year." Kan. Stat. Ann. § 8-142.

After holding a suppression hearing, the district court denied Mr. Ramstad's motion. The district court made no findings of fact, and simply held:

> As to the motion for an order suppressing illegally obtained evidence, the motion is denied and overruled. We're basing our decision primarily on Tenth Circuit law, which we believe is inconsistent with the position of the defendant. They want to change that law, we'll let them do it. I'm not going to try it for them. So that's the ruling of the court.

Ramstad, 219 F.3d at 1265. On appeal, a divided panel of this court remanded the case, finding "the record below . . . insufficiently developed regarding the suppression issue" and ordering the district court to "make specific findings as to whether the original traffic stop violated the Fourth Amendment, and if so whether Defendant subsequently gave consent sufficient to remove the taint of the illegal stop." Ramstad, 219 F.3d at 1265.

- 8 -

On remand, the government abandoned the statutory authority previously used to justify the stop. The government conceded that § 8-142 did not provide a legal basis for the stop. Nor did the government invoke the interstate compacts as providing justification for the stop. Instead, it asserted for the first time that a separate provision of the Kan. Stat. Ann., § 8-138a, authorized the stop. In addition, the government also suggested for the first time that the stop was permissible because Mr. Ramstad's rear license plate "was partially obscured."

In its ruling on remand, the district court agreed that neither of the interstate compacts originally cited by the government authorized the stop. 120 F. Supp. 2d at 977. Disagreeing with the government, however, the district court concluded that § 8-142 – the provision requiring Kansans to display every license plate issued them by the Kansas Division of Vehicles – justified the stop. Id. at 978. In reaching this conclusion, the district court expressly relied upon § 8-138a, a provision that grants "nonresident [motor vehicle] owners, when duly licensed in the state of residence," Kan. Stat. Ann. § 8-138a, the privilege of operating their vehicles on Kansas's roads. The district court interpreted § 8-138a as applying to duly licensed vehicles, and, after reading the statute in conjunction with § 8-142, concluded that by "duly licensed," the statute meant vehicles displaying "both license plates assigned to the vehicle." Id. at 978. The district court also concluded that Mr. Ramstad voluntarily consented to the search of his vehicle and

that Trooper Smith's subsequent search did not exceed the scope of that consent. Id. at 979, 981-82. The court concluded, however, that if the stop was illegal, Mr. Ramstad's consent to the search was insufficient to remove the taint of illegality. Id. at 981.

Soon after the district court's ruling, Mr. Ramstad filed a motion for reconsideration with the district court, arguing, among other things, that § 8-138a's "duly licensed" language only refers to duly licensed owners, not duly licensed vehicles. The district court denied Mr. Ramstad's motion, and this appeal followed.

## II. CONTROLLING LAW

As the Supreme Court explained in Whren v. United States, 517 U.S. 806 (1996), "The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." Id. at 809-10. Under Tenth Circuit precedent, routine traffic stops are considered akin to the investigatory stops sanctioned by the Supreme Court in Terry v. Ohio, 392 U.S. 1 (1968). United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998); United

States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996). Consequently, a traffic stop "is reasonable under the Fourth Amendment at its inception if the officer has either (1) probable cause to believe a traffic violation has occurred or (2) a reasonable articulable suspicion that 'this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.'"[1] United States v. Ozbirn, 189 F.3d 1194, 1197 (10th Cir. 1999) (internal citations omitted) (quoting United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)).

"When reviewing the denial of a motion to suppress, we accept the factual findings of the district court unless they are clearly erroneous and view the evidence in the light most favorable to the district court's determination. On appeal, we consider the totality of the circumstances and treat the ultimate determination of reasonableness under the Fourth Amendment as a question of law

---

[1]In Whren, the Supreme Court explained that "[a]s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." 517 U.S. at 810. We recently rejected the notion that Whren implicitly overruled our prior precedent holding that reasonable suspicion, as opposed to the higher standard of probable cause, is required to justify a traffic stop. See United States v. Callarman, 273 F.3d 1284, 1286-87 (10th Cir. 2001). We explained that while Whren and other Supreme Court decisions "indicate that probable cause is a sufficient ground for a stop, none of them indicates that it is necessary for a stop." Id. at 1286; see also United States v. Lopez-Soto, 205 F.3d 1101, 1104 (9th Cir. 2000) (collecting cases and reaching the same conclusion).

which we review de novo." United States v. Williams, 271 F.3d 1262, 1266 (10th Cir. 2001) (citations omitted).

### III.  LEGALITY OF THE STOP

The primary question before us is whether Kansas law empowered Trooper Smith to stop Mr. Ramstad for driving his vehicle in Kansas without two California license plates.  On this appeal, the United States argues § 8-138a authorized the traffic stop.[2]  The section, in its entirety, states:

> The provisions of this section shall apply only to the nonresident owner or owners of any motor vehicle constructed and operated primarily for the transportation of the driver or the driver and one or more nonpaying passengers.  Such nonresident owners, when duly licensed in the state of residence, are hereby granted the privilege of operation of any such vehicle within this state to the extent that reciprocal privileges are granted to the residents of this state by the state of residence of such nonresident owner.

Kan. Stat. Ann. § 8-138a (emphasis added).[3]

---

[2]The government's brief relies almost exclusively on § 8-138a, although it also argues that § 8-142 makes illegal the operation of a car in Kansas that does not have a privilege to use the highways under § 8-138a.

[3]Mr. Ramstad argues that even if Kansas law permitted the stop, "[Trooper] Smith's mistake of law as to the *source* of his authority to conduct a traffic stop undermines the legality of the stop."  Aplt. Br. at 23.  In recent years, however, the Supreme Court has emphasized that a traffic stop will be upheld if, objectively speaking, the officer possessed probable cause or reasonable suspicion to carry out the stop.  See Arkansas v. Sullivan, 532 U.S. 769, 771-72 (2001) (per curiam); Ohio v. Robinette, 519 U.S. 33, 38 (1996); Whren v. United States, 517 U.S. 806, 812-13 (1996).  Courts interpreting and applying Whren repeatedly have ruled that an arrest or stop will be constitutional if an objectively valid basis for carrying out the seizure exists, even if the ground cited by the officer for

(continued...)

- 12 -

Section 8-138a apparently grants to nonresident owners the privilege of operating in Kansas a vehicle only if "such vehicle" is "duly licensed" in the state of the owner's residence. From this, the negative implication is that such a vehicle not duly licensed in the state of the owner's residence is not permitted to be operated in Kansas and any such operation is therefore illegal.

Mr. Ramstad argues that § 8-138a refers only to driver's licenses, rather than to vehicle licenses. Several factors, however, lead us to conclude that the Kansas Supreme Court would construe § 8-138a as applying to vehicles' licenses. First, every decision by a Kansas court that has considered § 8-138a has assumed or held that the section requires that out-of-state vehicles be properly licensed in their home state. See State v. Wakole, 959 P.2d 882, 883 (Kan. 1998); State v. Wakole, 945 P.2d 421, 422 (Kan. Ct. App. 1997); State v. Hayes, 660 P.2d 1387, 1389 (Kan. Ct. App. 1982). Although Mr. Ramstad would dismiss these references as dicta, at least the reference in Wakole does not appear to be dicta. Had § 8-138a only applied to personal driver's licenses, as opposed to licensed vehicles, Wakole would not have been able to assert her "reciprocity" defense, and the Kansas courts would have been compelled to affirm, rather than to reverse, her conviction. In any event, even dicta can be persuasive evidence of how a state

_____

[3](...continued)
justifying the stop is unconstitutional. See, e.g., United States v. Bookhardt, 277 F.3d 558, 565 (D.C. Cir. 2002)..

court might rule on an issue of state law. Carl v. City of Overland Park, 65 F.3d 866, 872 (10th Cir. 1995).

Second, §8-138a is surrounded completely by other statutory provisions that govern a vehicle's registration, license plates, and tags. See Kan. Stat. Ann. §§ 8-126a (discussing different terms for license plates), 8-127 (imposing vehicle registration requirements), 8-128 (exempting certain vehicles from registration), 8-129 (outlining application procedure for vehicle registration), 8-131 (discussing issuance of vehicle registration), 8-132 (requiring the state to issue license plates to owners of all registered vehicles), 8-133 (establishing license plate display requirements), 8-135 (outlining procedure for transferring vehicles), 8-136 (governing dealer license plates), 8-139 (establishing procedures for lost or stolen license plates, registrations, and titles). Indeed, nearly all of the article of the Kansas Statutes Annotated where § 8-138a is located deals with vehicle registration and vehicle license plates and tags. See id. §§ 8-101 through 8-1,151. By contrast, the provisions pertaining to driver's licenses and the right of individuals to drive within Kansas fall entirely in a distinct and separate article of the chapter. See id. §§ 8-201 through 8-2,148. Just as importantly, the provision governing driver's licenses explicitly exempts nonresident drivers who possess a valid license from their home state from Kansas's driver's license requirements. Id. § 8-236. Thus, were a court to read § 8-138a as only applying to licensed

individuals, it would render redundant and superfluous the provision governing driver's licenses for nonresidents.

Third, the phrase, "when duly licensed in the state of residence" appears to at least include the proper license of the vehicle because, absent that link, the operator of any such vehicle would not be "duly licensed." This reading is enhanced by the adjective "such" that precedes the word "vehicle." Immediately following a requirement of being "duly licensed," to refer to "such vehicle" must mean that the vehicle, among other things, must be duly licensed.

Here, California law appears to require both a front and rear license plate for Mr. Ramstad's vehicle. California Vehicle Code § 5200 states that "[w]hen two license plates are issued . . . for a vehicle, they shall be attached to the vehicle for which they were issued, one in the front and the other in the rear." Cases from California suggest that vehicles, including motor homes, must display front license plates, see, e.g., People v. Gonzalez, 75 Cal. Rptr. 2d 272, 274 (Cal. Ct. App. 1998); People v. Dewey, 49 Cal. Rptr. 2d 537, 538 (Cal. Ct. App. 1996); People v. Lee, 67 Cal. Rptr. 709, 711 (Cal. Ct. App. 1968), and it is undisputed that Mr. Ramstad received a front license plate for his vehicle.

Thus, we conclude that the traffic stop for failure by Mr. Ramstad to display a front California plate was objectively reasonable and the stop was therefore legal.[4]

## IV. CONSENT TO SEARCH

We agree with the district court's conclusion that Mr. Ramstad's consent to search was knowingly and voluntarily given. Mr. Ramstad's documents had been returned to him and he had been advised by the officer, "that's all I've got. Have a safe trip, okay." The officer then asked if he could take "a quick look around" and Mr. Ramstad consented. Given the fact that we have found that the stop was legal, the record establishes that the consent to search was legal as well.

---

[4]We are troubled by the other legal justification for the stop offered by the government's brief – that some unidentified object or material partially obscured the motor home's rear license plate. The government offers absolutely no record evidence to support this factual claim, and our careful review of the record has unearthed no support. Indeed, the record contradicts the government's claim. As discussed above, Trooper Smith followed Mr. Ramstad's motor home for a period of time before stopping the vehicle. While following the car, Trooper Smith testified that he was able to read the letters and numbers on the vehicle's rear license plate and relay them to his dispatcher to "[run] the registration plate." We find the government's assertion of this argument negligent, careless, and misinformed, at best.

## V.  SCOPE OF THE SEARCH

Finally, Mr. Ramstad argues that the search exceeded the scope of the consent.  We disagree.  The scope of a search "is generally defined by its expressed object and is limited by the breadth of the consent given." United States v. Elliott, 107 F.3d 810, 814-15 (10th Cir. 1997) (internal quotations and citations omitted).  The expressed purpose of the search, to which Mr. Ramstad consented, was to look for drugs or contraband.  That certainly implies that the officer could look wherever drugs might be hidden.  United States v. Pena, 143 F.3d 1363, 1367-68 (10th Cir. 1998).

The only limitation that was placed on his consent was that the officer not tear anything up.  Other than passive surveillance, the only interactive activity that altered the vehicle was when the officer removed the speaker grill covers.  But, he replaced them without damage, so that activity cannot be regarded as tearing up the vehicle.

The defendant never objected to the duration of the search and never demanded to be present in the vehicle during the search.  Thus, his consent was reasonably interpreted by the officer to proceed as he did.[5]

---

[5]We deny appellant's motion to strike appellee's supplemental authority.

## VI.  <u>CONCLUSION</u>

Because we find no merit to any of the issues raised by the defendant on this appeal, we AFFIRM.